JANE DOE*34,* Petitioner,

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES,**
Respondent.

**No. V.**

United States Court of Federal Claims.

July 15, 2009[1].

---

* To protect the privacy interests of the plaintiff, on _____, 2009, the court issued an order directing the Clerk of the United States Court of Federal Claims to re-caption the case as *Jane Doe*34 v. United States.*

1. Opinion Originally Filed Under Seal On June 5, 2009.

Paul S. Dannenberg, Huntington, VT, for petitioner.

Glenn Alexander MacLeod, Washington, DC, for respondent.

## OPINION[2]

FIRESTONE, Judge.

This case comes before the court on the motion for review of the chief special master's decision on remand filed by the petitioner, Jane Doe 34,[3] pursuant to RCFC, App. B, Vaccine Rule 23. This is the fifth decision in this case.[1] In the last decision by this court, [citation redacted], the court determined that a hearing was needed to "consider, if reliable, the evidence that Petitioner seeks to present, and any evidence Respondent seeks to present in response, for the limited purpose of establishing the appropriate damages period and making a damages determination." On remand, the chief special master determined that the appropriate damages period was approximately thirty days following the petitioner's release from the hospital after being treated for Reye's syndrome and that $5,841.50 was the appropriate amount of damages to award. For the reasons stated below, this court **AFFIRMS** the chief special master's decision.

## BACKGROUND

The facts underlying the petitioner's claim are set forth in this court's July 13, 2007 order and the earlier opinions of the court. In brief, on July 29, 1999, Ms. Doe*34 filed a suit for compensation under the National

---

2. Pursuant to Rule 18(b) of Appendix B of the Rules of the United States Court of Federal Claims ("RCFC, App.B"), this Opinion and Order was initially filed under seal. The parties were then provided the opportunity to propose redactions of any of the information herein.

3. [redacted] The petitioner was fifteen years old when she received the Hepatitis B vaccinations at issue in this case.

4. [Because the previous decisions named the plaintiff, the citations to these decisions previously contained in this footnote have been redacted prior to publication.]

Childhood Vaccine Act of 1986, as amended, 42 U.S.C. § 300aa–1–34 (1986) ("Vaccine Act"). Special Master E. LaVon French issued a decision dismissing the petition on March 11, 2004. The petitioner appealed the decision, and this court reversed and remanded the case for a calculation of damages on January 26, 2005. [citation redacted] Due to the retirement of Special Master French, the case was reassigned to Chief Special Master Gary J. Golkiewicz. On February 28, 2007, the chief special master issued his decision on remand. [citation redacted] The chief special master, based on the record from the original hearing, issued a damages decision. On this first remand, the chief special master denied the petitioner the opportunity to present an expert pediatric neurologist's report and other medical evidence to show that she suffered long-term sequelae of the Reye's syndrome that had been caused by her Hepatitis B vaccinations. The chief special master determined that the petitioner suffered sequelae for approximately thirty days following her release from the hospital and awarded the petitioner $5,000 for pain and suffering and $841.50 in past unreimbursable expenses. *See id.* at *2–3, *7 n. 5.

The petitioner timely filed a motion for review, which this court granted-in-part and denied-in-part on July 13, 2007. [citation redacted] As stated above, the court again remanded the case to the chief special master to allow the petitioner to present her expert evidence to show that she continued to suffer damages following her recovery from Reye's syndrome beyond the thirty-day period determined by the chief special master.

On this second remand, the petitioner filed the expert report of neurologist Ronald I. Jacobson, M.D. *See* Pet'r's Exhibit F ("Jacobson Rep."). In his report, Dr. Jacobson stated, "Taken in its entirety[, the petitioner] has a chronic post[-]illness encephalopathy marked by recurrent migraine headaches, hand numbness, and diminished academic performance and diminished motor skills." *Id.* at 2. Dr. Jacobson reported:

> It is my opinion, to a reasonable degree of medical certainty, that the illness which prompted [the petitioner's] hospitalization on December 17, 1996 was Reye['s][s]yndrome post[-]hepatitis B vaccination.... Reye['s] syndrome is known to result in neurologic sequelae including cognitive impairments, motor impairment, and sensory dysfunction. Although migraine headaches have not been specifically linked with Reye['s] syndrome, migraine triggers or exacerbations are known to occur because of a variety of specific insults to the central nervous system. For example, head trauma is a well-known cause of migraine headaches.... Once a pattern of migraine headaches becomes established, the migraine disorder may last for many years. Recurrent migraine headaches cause recurrent pain and further impairments in functioning including decreased attendance at school or work and greater difficulty with the extra demands leading to increased need for sleep. *Finally, the most appropriate neurologic conclusion is that [the petitioner] suffers from post-Reye['s][s]yndrome encephalopathy, for which there are many similar examples after other insults to the central nervous system ....*

*Id.* at 3 (emphasis added throughout).

In response, the respondent filed the expert report of John T. MacDonald, M.D., who opined that there was no reliable evidence in the petitioner's medical records or the literature on Reye's syndrome that would support the petitioner's claimed damages from her Reye's syndrome. Resp't's Exhibit K at 1–3 ("MacDonald Rep."). Dr. MacDonald opined that mild cases of Reye's syndrome, like the petitioner's, are known to fully resolve and that lasting neurologic problems due to a chronic encephalopathy are not found in such patients. He stated, "In my experience, only the more severe cases of Reye's [s]yndrome resulted in a chronic encephalopathy." *Id.* at 2. The parties also filed medical literature in support of their respective experts' opinions.

On August 7, 2008, the chief special master held an evidentiary hearing at which Dr. Jacobson, Dr. MacDonald, and James E. Heubi, M.D., testified. Dr. Heubi was the petitioner's expert during the causation phase of the case and had filed a supplemental affidavit during that phase addressing the

issue of how long the petitioner's Reye's syndrome lasted. Pet'r's Ex. B (filed Mar. 27, 2006). In this affidavit, he stated, "It would take time for a child to recover completely [from Reye's syndrome] and *in this case that may not have occurred until mid-January [1997]." Id.* at 2 (emphasis added). Dr. Heubi testified at the August 7, 2008 hearing at the chief special master's request and over the objection of the petitioner.

At the same hearing, Dr. Jacobson testified on behalf of the petitioner that during her Reye's syndrome, the petitioner suffered an acute encephalopathy that resulted in permanent and significant neurological sequelae, although he conceded that no chronic encephalopathy had been observed through any scanning or test result. Hr'g Tr. ("Tr.") 56:8–15, Aug. 7, 2008.[5],[6] Additionally, he testified that the petitioner experienced "substantially elevated" ammonia levels during her Reye's syndrome. Tr. 13:2–19. He stated that "ammonia can be looked at in and of itself as a neurotoxin impairing brain function" and that "it's really also a marker of multiple abnormalities that are occurring in Reye's syndrome that represent toxicity in cells," including brain cells. Tr. 13:22–14:3.

At the hearing, Dr. Heubi, who, as noted above, testified at the request of the chief special master, ratified his earlier opinion that it was more likely than not that the petitioner's Reye's-syndrome-related encephalopathy resolved itself and did not result in any long-term neurologic psychiatric sequelae. Tr. 78:8–14, 79:23–24. Dr. Heubi testified that it would be "possible although unlikely that at this level of neurologic dysfunction [the petitioner] sustained any long-term neuropsychiatric consequences." Tr. 86:10–15. Additionally, Dr. Heubi stated that to the extent petitioner was resting her

claim of long-term sequelae of Reye's syndrome on the fact that after her hospitalization she began experiencing migraine headaches, "migraine headaches [are] just not something that's ever been brought to my attention" as being related to Reye's syndrome. Tr. 82:20–23. He testified that the petitioner had a mild case of Reye's syndrome that would be graded a 1 on a 1 to 5 scale and that it is "generally true" that patients with grade 1 or 2 Reye's syndrome recover uneventfully. Tr. 84:2–8.

Dr. MacDonald testified on behalf of the respondent and stated that, in his opinion, the petitioner recovered fully from the effects of Reye's syndrome within thirty days. Tr. 108:18–22. He stated,

> I think clinically [the petitioner] was ill primarily the first day or two, and then there was recovery. They sent her home after day five. *I think by that point it appears from the record she was doing pretty well.* When she was seen [early the following year], when she came in for the respiratory things, by the reports she was doing well, and I assume that means recovered from her Reye's [s]yndrome.... I think she recovered very quickly over several days. If there [were] some subtle changes, they must have disappeared over the Christmas holidays, New Years, in January. *I think there may have been some subtle signs for that first month or so. We don't have absolute proof of that, but after that it appears she, I think, recovered from the encephalopathy part.*

Tr. 108:2–17 (emphasis added throughout).

Dr. MacDonald further testified that because patients with any grade of Reye's syndrome, be it mild, moderate, or severe, may experience elevated ammonia levels, "in the

---

5. On this point, the transcript reads as follows:
   [Respondent's Counsel:] Doctor, I just want to make sure I understand your position as to when Jane suffered her encephalopathy with Reye's [s]yndrome. And that is your opinion, right?
   [Dr. Jacobson:] Correct.
   [Respondent's Counsel:] She suffered an acute encephalopathy that insulted her brain that resulted in permanent and significant neurologic sequela[e]; is that accurate?
   [Dr. Jacobson:] Yes.

   [Respondent's Counsel:] This insult has not been observed objectively through any scanning or test result; is that correct?
   [Dr. Jacobson:] Right.
   Tr. 56:8–18.

6. Stedman's Medical Dictionary defines the relevant terms as follows: an insult is "[a]n injury, attack or trauma," *Stedman's* 205250 (27th ed.2000), an injury is "[t]he damage or wound of trauma," *id.* at 204120, and an encephalopathy is "[a]ny disorder of the brain." *Id.* at 129640.

individual case, it's not helpful in predicting sequela[e]." Tr. 104:6–8. He added that, with Reye's syndrome, the encephalopathy component is more closely related to brain injury or worsened mental status than an elevated ammonia level. Tr. 106:3–14 ("[I]t's the mental status encephalopathy part that's critical once you've established the diagnosis [of Reye's syndrome]. We'll follow the ammonia level, but that's not the critical part."). When asked his opinion as to whether the petitioner suffered any permanent neurological sequelae as a result of her Reye's syndrome, Dr. MacDonald stated, "Based on the records we have, I don't see any permanent sequela that I would support." Tr. 109:2–3. When asked about the petitioner's decreased academic performance post-Reye's syndrome, Dr. MacDonald stated, "I don't see that as somehow directly related to her five-day hospitalization. . . ." Tr. 110:25–111:3.

Finally, when questioned about whether he had noted a delay between the recovery from Reye's syndrome and the development of the petitioner's neurological symptoms, Dr. Mac-Donald testified,

> My experience has been that those who are brain damaged significantly, that we can actually measure, we usually know [ ] when they leave the hospital if there's going to be a problem. . . . [I]n a fifteen-year-old or teenager, at least in my experience, those that are injured significantly, very quickly it's obvious. . . . *[I]t's not been my experience [that] there are more subtle things that show up later, particularly in someone with normal brain scans.* . . .

Tr. 111:9–22 (emphasis added). It is not disputed that the petitioner's MRI and CT scans were normal following her hospitalization. For example, Dr. MacDonald recalled that the petitioner "had a CT head scan done I think in [19]99 . . . . [a]nd then on 11/11/99 had a [brain] MRI [and had another] on 2/4/2000" and that the results of all of them

were normal. Tr. 103:3–11. He testified that

> [i]f your theory is that those symptoms are related to an injury, whatever that injury may be, that it was severe enough at the time to cause permanent brain [injury], I'm sure it would be very supportive to see on . . . MRI brain scans evidence of injury . . . *[t]he patients . . . that have brain injuries that result in permanent deficits, now with the sophisticated MRI scans frequently . . . the abnormalities are pretty obvious.*

Tr. 102:11–19 (emphasis added). In contrast with this testimony, Dr. Jacobson testified that he did not recall whether the petitioner had any MRI scans performed in the years following her Reye's syndrome, although he testified that no tests performed during her hospitalization indicated increased intracranial pressure, decreased motor skills, or other indications of brain injury or insult. Tr. 43:5–44:18. He testified that the insult was not observable by means other than the migraine headaches and decreased academic performance.[7] Tr. 44:14–18.

After considering the additional evidence on the second remand, the chief special master found "that the original finding of approximately [thirty] days is the appropriate period for calculating damages." Dec. on Remand at 5. The chief special master based his finding "upon a determination that the testimony of Dr. MacDonald and Dr. Heubi was highly credible, while in contrast the testimony of Dr. Jacobson was highly speculative and thus not credible." *Id.*

In particular, the chief special master determined that although Dr. Jacobson is a "well-credentialed [p]ediatric [n]eurologist," *id.* at 5 n. 6, Dr. Jacobson could not support his opinion that the petitioner's migraine headaches, diminished academic and motor skills and hand numbness were sequelae of her Reye's syndrome. The chief special

7. Specifically, Dr. Jacobson testified as follows:
[Respondent's Counsel:] [I]t's still your opinion that [the petitioner] suffered a brain injury as a result of the Reye's [s]yndrome?
[Dr. Jacobson:] I don't believe there was brain injury.
[Respondent's Counsel:] Brain insult?
[Dr. Jacobson:]Yes.

[Respondent's Counsel:] *An insult that is not observable by any objective means other than the migraine headaches?*
[Dr. Jacobson:] Correct.
[Respondent's Counsel:] And the academic performance?
[Dr. Jacobson:] Correct.
Tr. 44:8–18 (emphasis added throughout).

master noted that Dr. Jacobson's testimony was conflicting. While Dr. Jacobson opined at one point that all of the petitioner's problems were linked to the encephalopathy caused by her bout with Reye's syndrome, he also testified that they may not be linked. For example, Dr. Jacobson testified that "the hand numbness was not part of the encephalopathy," *id.* at 5–6 (*citing* Tr. 60), and that the same was true with the diminished academic and motor skills-that is, that "they occurred post[-]Reye's syndrome but were not caused directly by the Reye's syndrome." *Id.* at 6 (*citing* Tr. 61–62). Similarly, the chief special master noted that while Dr. Jacobson claimed that the petitioner's migraines were caused by the brain insult she allegedly suffered from her Reye's syndrome, Dr. Jacobson also acknowledged the lack of support for such a causal connection when pressed in questioning. At the hearing, Dr. Jacobson was asked on direct examination, "In your opinion, could Reye's [s]yndrome have caused this migraine headache that Jane suffered?" Tr. 24:21–22. Dr. Jacobson responded:

> This is an interesting question in this case. And in looking at my experience with [ ] Reye's [s]yndrome, although it's not been a recent experience because Reye's [s]yndrome is very rare now, *in the literature I had appropriate trouble looking at migraines as sequelae of Reye's [s]yndrome.* In thinking through this, though, I came to the conclusion, based on experience with taking care of large numbers of patients, that I see no reason to think that given that Reye's [s]yndrome is an injury to the nervous system akin to trauma, that if someone did not have headaches and then shortly after having Reye's [s]yndrome began having recurring headaches and migraines, that migraine headaches could be a sequelae of the Reye's [s]yndrome.

Tr. 24:23–25:13 (emphasis added).

However, when pressed on cross-examination, Dr. Jacobson testified:

> [Respondent's Counsel:] ... [T]he Special Master needs to know are these things listed here, which seem serious-diminished motor skills, diminished academic performance[,] hand numbness and recurrent migraine headaches, is that all related to her, more likely than not, her chronic post-illness encephalopathy?
>
> [Dr. Jacobson:] Yes.
>
> [Respondent's Counsel:] *Do you agree that the migraine headaches have not been specifically linked with Reye's [s]yndrome?*
>
> [Dr. Jacobson:] *Correct.*

Tr. 62:24–63:9 (emphasis added throughout). In summary, the chief special master noted that Dr. Jacobson's opinion was essentially based on the possibility that Reye's syndrome *could* be the cause of the petitioner's migraines. Dec. on Remand at 15.

The chief special master also noted that Dr. Jacobson never provided any meaningful medical record support for his contention that the petitioner had suffered a chronic encephalopathy in this case. The chief special master explained that "no treating doctor record[ed] in the contemporaneous medical records any relationship between [the petitioner's] migraines and her Reye's syndrome." *Id.* at 11. It was not disputed that two MRIs and a CT scan were performed and were normal, and that petitioner's treating doctor, Nathaniel Ratnasamy, M.D., who had testified at the June 2003 causation hearing, stated that the petitioner did not have "encephalopathic symptoms at the times I saw her in April and June" following her hospitalization with Reye's syndrome in late December of the previous year. *Id.* at 9 (further citation omitted). The chief special master further noted that according to the petitioner's medical records, her headaches originally seemed to be related to a sinus infection. *Id.* at 3–4, 9; *see* Tr. 66:16–67:12.

As to the testimony and other evidence regarding the petitioner's ammonia levels, the chief special master acknowledged that ammonia is a neurotoxin that can impair brain function. However, he noted that the literature and the experts stated that "ammonia levels identify risk factors; they are not diagnostic in individual cases." Dec. on Remand at 12.[8]

---

8. Additionally, the petitioner's medical records contain no evidence that her ammonia levels

Finally, the chief special master expressed concern that Dr. Jacobson could not refute the established medical evidence that "cases of mild Reye's [s]yndrome recover uneventfully." *Id.* at 8. The chief special master explained that all experts agreed that Reye's syndrome "has a range of presentations, which are usually measured on a scale of 1 to 5 or 0 to 6 with the low number being the mildest.... The experts also agreed that [the petitioner's] Reye's syndrome was mild." *Id.* (internal citations omitted). The chief special master noted that while Dr. Jacobson stated that mild Reye's syndrome can lead to adverse sequelae, *id.* (*citing* Tr. 24:6–7 ("mild Reye's [s]yndrome can have adverse sequelae after recovery")), Dr. Heubi maintained the opinion he had expressed at the June 17, 2003 causation hearing that it is more likely than not that the level of encephalopathy experienced by the petitioner did not result in any significant neurologic psychiatric sequelae. Dec. on Remand at 8; *see also* Tr. 78:2–79:24. Similarly, Dr. MacDonald explained that both his experience treating Reye's syndrome patients and the medical literature indicated that mild cases of Reye's syndrome do not result in long-term neurological problems. Tr. 110:3–6; MacDonald Rep. at 2–3. In his written report, Dr. MacDonald stated,

> I disagree with Dr. Jacobson's opinion that [the petitioner's] migraine headaches can be directly linked to her Reye's [s]yndrome in 1996. *In my experience, only the more severe cases of Reye's [s]yndrome resulted in a chronic encephalopathy. Those with chronic neurological problems had severe and protracted elevations of intracranial pressure during the acute illness and this was not present in this case. In fact, [the petitioner's] neurological symptoms were quite mild.* In such cases, complete recovery typically occurred within a month or so. Long[-]term sequela ... was related (1) to the severity of coma and (2) in those younger than 18 months.

MacDonald Rep. at 2 (emphasis added). It is undisputed that the petitioner's Reye's syndrome did not cause a coma.

remained elevated after the thirty-day period fol-

Based on these findings and others, the special master ultimately found the testimony and opinions of Dr. Heubi and Dr. MacDonald to be "credible and convincing" as well as "fully supported by the medical literature and the records in this case." Dec. on Remand at 11. Conversely, he found Dr. Jacobson's testimony to be unsupported by the petitioner's medical records and the literature. *Id.* Therefore, he rejected the petitioner's claim that she was entitled to damages for her problems with headaches, hand numbness, and diminished academic performance and motor skills.

Taking all of the evidence into account, the special master determined that his previous damage award was appropriate and concluded that the petitioner was entitled to $5,841.50 for the thirty-day period following her release from the hospital for both pain and suffering and for unpaid expenses.

## STANDARD OF REVIEW

A special master's decision may not be disturbed on review unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa–12(e)(2)(B); RCFC, App. B, Vaccine Rule 36(b). Findings of fact are reviewed under an "arbitrary and capricious" standard, legal questions are reviewed under a "not in accordance with law" standard, and discretionary rulings are examined under an "abuse of discretion" standard. *Munn v. Sec'y of HHS*, 970 F.2d 863, 870 n. 10 (Fed. Cir.1992) (*cited in, e.g., Pafford v. Sec'y of HHS*, 451 F.3d 1352, 1355 (Fed.Cir.2006)). "In general, reversible error is 'extremely difficult to demonstrate' if the special master 'has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision.'" *Lampe v. Sec'y of HHS*, 219 F.3d 1357, 1360 (Fed. Cir.2000) (*quoting Hines v. Sec'y of HHS*, 940 F.2d 1518, 1528 (Fed.Cir.1991)).

Under the Vaccine Act, special masters shall consider all "relevant medical and scientific evidence contained in the record," 42 U.S.C. § 300aa–13(b)(1), as well as

lowing her hospitalization for Reye's syndrome.

(A) any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death, and

(B) the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions.

*Id.* However, "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary" is not binding on the special master, and in determining the weight to be afforded such evidence, the special master "shall consider the entire record." *Id.* The special master's "assessments of the credibility of the witnesses and the relative persuasiveness of the competing medical theories of the case" are "virtually unchallengeable on appeal." *Lampe,* 219 F.3d at 1362. The special master has "broad discretion in determining credibility because he saw the witnesses and heard the testimony." *Bradley v. Sec'y of HHS,* 991 F.2d 1570, 1575 (Fed. Cir.1993).

## DISCUSSION

### I. The Chief Special Master Did Not Err in Securing Dr. Heubi's Participation.

The petitioner asserts that, in requiring the participation of Dr. Heubi, the chief special master "ambushed petitioner's damages hearing[ ] by forcing her to present evidence that [petitioner] specifically rejected as irrelevant." Pet'r's Mot. Review and Objections ("MFR") at 4. She argues that the chief special master exceeded the scope of the remand by requiring this testimony and that it was unfair for the chief special master to "require the petitioner to present evidence she [did] not wish to present." *Id.* In so doing, argues the petitioner, the chief special master violated "the Court's remand order, and thus the law of the case." *Id.* at 3.

In response, the government asserts that "[t]he Chief Special Master's finding that Dr. Heubi's testimony was relevant in determining whether petitioner had suffered a serious and lasting brain injury as a consequence of her mild Reye's [s]yndrome is well-supported by the record." Resp't's Resp. to MFR ("Resp.") at 9. The government notes that

this court's remand order "specifically referenced Vaccine Rule 8(c), which directs the special master to consider all relevant and reliable evidence, governed by principles of fundamental fairness to both parties." *Id.* at 10 ( [citation redacted] (*quoting-in-turn* RCFC, App. B, Vaccine Rule 8(c)) (internal quotation marks omitted)). Therefore, argues the respondent, in obtaining the testimony of Dr. Heubi, the chief special master acted in accordance with Vaccine Rule 8(c) and "was being 'fundamentally fair' to respondent, as respondent had always requested that Dr. Heubi be required to testify in this matter, and that respondent be allowed to cross-examine him." Resp. at 10 n. 6. Additionally, the respondent notes that obtaining Dr. Heubi's testimony did not preclude the petitioner from presenting other evidence.

■ As stated above, although this court's order remanding this case to the chief special master stated that "the court will allow Petitioner to present evidence in the damages phase to demonstrate what she believes to be the full extent of the damages she suffered," [citation redacted], the same order also noted that under Vaccine Rule 8(c), "the Special Master is directed to 'consider *all* relevant and reliable evidence, *governed by principles of fundamental fairness to both parties.*'" *Id.* (*quoting* RCFC, App. B, Vaccine Rule 8(c) (emphasis added throughout)). Thus, although the primary purpose of the remand was to permit the plaintiff to introduce evidence that had been excluded, the chief special master was not prohibited from hearing further evidence pertaining to damages promoted by either party. Indeed, pursuant to Vaccine Rule 8(c), the chief special master is granted authority to consider such evidence as long as it is relevant and reliable. Thus, the court agrees with the respondent that the chief special master did not abuse his discretion in obtaining Dr. Heubi's participation.

### II. The Chief Special Master's Fact–Finding and Credibility Determinations Were Not Arbitrary or Capricious, an Abuse of Discretion, or Contrary to Law.

The petitioner alleges numerous errors in the fact-finding and credibility determina-

tions supporting the chief special master's decision. The petitioner argues that the chief special master "failed to consider ... highly relevant evidence and the medical articles and studies cited, medical record references, the evidence of high ammonia levels and high intracranial pressure" and thus "erred in his review of the record." MFR at 11. The petitioner asserts that in his remand decision, the chief special master did not give sufficient weight to the testimony of the petitioner's expert, Dr. Jacobson, as regards the relationship between the petitioner's claimed sequelae and her Reye's syndrome. The petitioner also argues that the chief special master's remand decision did not fully address evidence from her treating physician, which indicated that her symptoms persisted for at least six months after her second Hepatitis B vaccination, and that the chief special master "completely ignored" evidence regarding the petitioner's decreased academic performance. *Id.* at 11–12. Finally, the petitioner argues that the chief special master "ignored evidence that the petitioner had a brain injury." *Id.* at 13.

In response, the respondent argues that the chief special master correctly "found Dr. Jacobson's testimony 'highly speculative and thus not credible.'" Resp. at 12 (*quoting* Dec. on Remand at 5). The respondent asserts that

> Dr. Jacobson's opinion, that petitioner suffered a lasting and significant brain injury as a consequence of her Reye's [s]yndrome, strained credulity. By all records and testimony, petitioner suffered the mildest form of Reye's [s]yndrome (i.e., "level 1").... A preponderance of the medical literature and expert testimony indicated that patients with level 1 Reye's syndrome recover uneventfully.

Resp. at 12–13. The respondent refutes the petitioner's claim that the special master did not address the evidence of the petitioner's elevated ammonia level, her decreased academic performance, and high intracranial pressure. The respondent explains that each of these issues was addressed in the chief special master's decision.

■ This court agrees with the respondent that the chief special master did not err in

reaching his determinations and that they are not arbitrary or capricious. As noted above, "reversible error is 'extremely difficult to demonstrate' if the special master 'has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision.'" *Lampe,* 219 F.3d at 1360 (*quoting Hines,* 940 F.2d at 1528). In the instant case, the decision on remand indicates that the chief special master fulfilled each of these criteria and reached a decision for which there is substantial evidentiary support. As such, his decision cannot be held to be arbitrary and capricious and shall be affirmed.

The chief special master's decision indicates that he properly considered all the evidence of record. His decision on remand discusses in detail each of the main points raised by the parties, including the petitioner's claim that she had suffered a chronic encephalopathy and related sequelae following her case of Reye's syndrome. He considered the significance of her elevated ammonia levels and whether her decreased academic performance, decreased motor skills, or hand numbness were sequelae of her Reye's syndrome.

For the reasons discussed below, this court finds that there was ample evidence to support the chief special master's findings. As discussed above, Dr. Heubi and Dr. MacDonald both testified that in their opinion, the petitioner's claimed long-term sequelae were not connected to the petitioner's experience of Reye's syndrome. The other evidence of record, including the literature and the petitioner's medical records, provided substantial support for such a conclusion. In contrast, it was reasonable for the chief special master to give less weight to the testimony of Dr. Jacobson. As the chief special master observed, Dr. Jacobson did not seem certain of his conclusion that any of the claimed sequelae resulted from the petitioner's Reye's syndrome or the encephalopathy she claims resulted therefrom. For example, at one point, Dr. Jacobson testified that he could not state that the hand numbness was related to the claimed encephalopathy. *See* Tr. 60:3–19 (Dr. Jacobson states, "I'm not stating [the hand numbness is] part of the

encephalopathy.... All I can say is that she had [the hand numbness] afterwards, *but I can't say it['s] precisely linked to her Reye's [s]yndrome* " (emphasis added)), yet he later testifies that this and other claimed sequelae are more likely than not related to her chronic, post-illness encephalopathy. Tr. 62:24–63:6. In response to the question, "Do you agree that the migraine headaches have not been specifically linked with Reye's [s]yndrome?", Dr Jacobson answered, "Correct." *Id.* at 63:7–9. Additionally, as the chief special master observed, Dr. Jacobson "used the 'rather coarse tool' of clinical thinking to conclude that 'there are problems [the petitioner] had afterwards and there are problems that she did not have before, and that's an element of my thinking in this case.' " Dec. on Remand at 7 (*quoting* Tr. 46:4–7).

The claimed sequelae discussed in most detail at the August 7, 2008 hearing were the petitioner's recurrent migraine headaches. While the medical records do indicate that the petitioner suffered from migraines at some point after she recovered from Reye's syndrome, the record contains ample evidence to support the chief special master's finding that there is no causal relationship between the two. Significantly, none of the three experts, including the expert promoted by the petitioner, were able to testify that Reye's syndrome has been specifically linked to migraine headaches. As detailed above, both Dr. Heubi and Dr. MacDonald testified that they knew of no documented connection between Reye's syndrome and migraine headaches. Dr. Jacobson also testified that he "had appropriate trouble" in finding any literature documenting such a link, Tr. 25:2–4, and agreed that migraines have not been specifically linked with Reye's syndrome. Tr. 63:7–9. Indeed, as the chief special master stated, the record indicates that Dr. Jacobson's opinion seemed to rest largely on his belief that migraines can follow from cases of head trauma and that Reye's syndrome can be analogized to head trauma. Significantly, there was no evidence from any of petitioner's medical test results that would indicate that the petitioner's encephalopathy from Reye's syndrome did not fully resolve. Her MRIs and CT scans were normal and her early headaches were tied to a sinus infection following her release from the hospital. Her treating doctor did not find any evidence of a lasting encephalopathy. The evidence taken as a whole provides an adequate basis for the chief special master's conclusion that the petitioner's headaches were not sequelae of her Reye's syndrome, and this conclusion is therefore not arbitrary and capricious.

Similarly, the chief special master's conclusion that none of the other claimed sequelae, such as the petitioner's hand numbness and decreased academic and motor skills, were related to her Reye's syndrome is well-supported by the evidence. While the petitioner's academic records do indicate that her academic performance declined sometime after her Reye's syndrome, the record contains sufficient evidence to support the chief special master's finding that there was no link between the two. While the evidence showed that decreased academic and motor skills could result from more severe cases of Reye's syndrome, the record indicates that the petitioner suffered from only a mild form. All three experts testified to this fact. *See* Tr. 38:14–16 (Dr. Jacobson), 80:19–22 (Dr. Heubi), and 112:6–113:15 (Dr. MacDonald).

Taken as a whole, there is ample support in the record for the chief special master's determinations that the petitioner's Reye's syndrome had fully resolved within thirty days from its onset, that none of the claimed long-term sequelae were related to her Reye's syndrome, and that therefore thirty days was the appropriate period of damages. Accordingly, this court finds that the chief special master did not err in these determinations.

### III. The Chief Special Master Did Not Err in Assessing the Petitioner's Pain and Suffering.

The petitioner asserts that the chief special master's determination that the $5,000 awarded for pain and suffering is "inadequate and an insult to the petitioner." MFR at 15–16. She argues that "[e]specially in this case, where there are basically no other benefits available to petitioner (only $841 found by the [First] Decision on Remand),

the award for pain and suffering should be maximized pursuant to congressional intent." *Id.* at 14. The petitioner also argues that it was improper for the chief special master to refer to other vaccine program cases in determining the appropriate amount of damages to be awarded to the petitioner.[9] The respondent counters that the amount of the award was properly determined and should be upheld.

 The court finds that the chief special master did not err in determining that $5,000 was appropriate compensation for the petitioner's pain and suffering. As explained above, the chief special master correctly determined that the appropriate period for damages was thirty days after developing Reye's syndrome and in determining the extent of the damages the petitioner suffered. The court finds that there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case. *Cf. Saxton v. Sec'y of HHS,* 3 F.3d 1517, 1519 (Fed.Cir.1993) (special master did not err in using his prior experience with attorneys in reviewing a fee petition); *Ultimo v. Sec'y of HHS,* 28 Fed.Cl. 148, 152–53 (1993) ("It is incumbent upon the Chief Special Master to apply his body of knowledge … to the resolution of Vaccine Act cases; it is important for a court to bring to the case general knowledge as well as the ability to analyze the instant facts."); *see also* 42 U.S.C. 300aa–15(a)(4) (authorizing "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000"). Given the brief duration of the damages period and the fact that there were no lasting sequelae, this court finds that the chief spe-

cial master did not abuse his discretion in determining that $5,000 was an appropriate amount of compensation for her pain and suffering, and this award shall be upheld.

## CONCLUSION

For the reasons stated above, the petitioner's motion for review of the decision on remand is **DENIED,** and the chief special master's decision of January 30, 2009 is **AFFIRMED.** The clerk of the court is directed to enter judgment for the petitioner accordingly.

**IT IS SO ORDERED.**

sation")). Accordingly, this court cannot adjust the award amount to compensate for inflation.

---

9. The petitioner also argues that the damages award should be adjusted for inflation, as the purchasing power of $5,000 today is considerably less that it was in 1986, when the vaccine program was created. As the chief special master correctly stated in his first decision on remand, "Neither the statute or [a special master's] authority allows such an adjustment." [citation redacted] (*citing* 42 U.S.C. § 300aa15(f)(4)(A) (1993) ("payment of compensation under the Program shall be determined on the basis of the net present value of the elements of the compen-

