# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 24-136V**

ANDREW MONROE,

                    Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

                    Respondent.

Chief Special Master Corcoran

Filed: March 31, 2026

*Jessi Carin Huff, Maglio Christopher & Toale, PA, Seattle, WA, for Petitioner.*

*Irene Angelica Firippis, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On January 29, 2024, Andrew Monroe filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered Guillain-Barré syndrome ("GBS"), a defined Table injury, after receiving an influenza ("flu") vaccine on November 27, 2021. Petition at ¶¶ 1, 21, 24-25. The matter was assigned to the "Special Processing Unit" (the "SPU"), and although Respondent conceded entitlement, the parties were unable to resolve damages on their own.[3] I thus ordered briefing on the matter, and notified the parties that I would resolve this dispute via an expedited "Motions Day" hearing, which

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Approximately two months after Petitioner was determined entitled to compensation, Respondent informed me that the parties had reached an impasse in their damages discussions and requested that I set a briefing schedule. No. 30.

ultimately took place on February 17, 2026. ECF Nos. 30, 35; Hearing Order (Non-PDF) issued February 10, 2026.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount **$120,000.00 for past pain and suffering.**

## I.      Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress

contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 499-590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## II.     Prior SPU Compensation of GBS Pain and Suffering

### A.     General Data Regarding Compensation in SPU Flu/ GBS Cases

Flu/GBS cases have an extensive history of informal resolution within the SPU. As of January 1, 2026, 1,004 GBS cases have been resolved since SPU's inception ten years ago. Compensation has been awarded in the vast majority of cases (954), with the remaining 50 cases dismissed.

The data for all categories of theses damages decisions reflect the expected differences in outcome, summarized as follows:

| | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[4] Agreement |
|---|---|---|---|---|
| Total Cases | 72 | 475 | 23 | 384 |
| Lowest | $96,008.66 | $9,050.40 | $20,000.00 | $3,098.64 |
| 1st Quartile | $148,568.21 | $125,000.00 | $142,500.00 | $100,000.00 |
| Median | **$167,100.02** | **$165,000.00** | **$252,000.00** | **$150,000.00** |
| 3rd Quartile | $186,457.51 | $240.831.00 | $386,685.56 | $216,030.00 |
| Largest | $244,390.18 | $2,282,465.84 | $985,000.00 | $1,200,000.00 |

---

[4] One award was for an annuity only, the exact amount which was not determined at the time of judgment.

## B. Adjudication of Pain and Suffering in GBS Cases

Only a small minority of cases have involved a special master's adjudication of damages issues. The written decisions setting forth such determinations provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[5]

As of January 1, 2026, on nearly every occasion that SPU has had to resolve the appropriate award for GBS-associated pain and suffering, over $100,000.00 has been awarded (with a lower sum ($92,500.00) only awarded once). The remaining sixty-one (71) awards far exceeded $100,000.00. The first-quartile value is $145,000.00. The median is $161,500.00. The third-quartile value is $175,000.00. The largest award was $225,000.00.

These decisions are informed by what is known about GBS, including its description as set forth in the Vaccine Injury Table ("Table"). Pursuant to the Table, vaccine causation is presumed for GBS with an onset 3 - 42 days (not less than 3 days, and not more than 42 days) after receipt of a seasonal flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(D). The Qualifications and Aids to Interpretation ("QAI") explain:

> GBS is an acute monophasic peripheral neuropathy that encompasses a spectrum of four clinicopathological subtypes… The interval between the first appearance of symptoms and the nadir of weakness is between 12 hours and 28 days. This is followed in all subtypes by a clinical plateau with stabilization at the nadir of symptoms, or subsequent improvement without significant relapse. Death may occur without a clinical plateau. Treatment-related fluctuations in all subtypes of GBS can occur within 9 weeks of GBS symptom onset, and recurrence of symptoms after this timeframe would not be consistent with GBS.

42 C.F.R. § 100.3(c)(15)(I) (2017). The three most common subtypes are acute inflammatory demyelinating polyneuropathy ("AIDP"); acute motor axonal neuropathy ("AMAN"); and acute motor and sensory neuropathy ("AMSAN"). *Id.* The onset of each is

---

[5] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

marked by "bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs." *Id.* at (c)(15)(II). The fourth subtype – Fisher syndrome or Miller-Fisher syndrome – has a different onset of "bilateral ophthalmoparesis; bilateral reduced or absent tendon reflexes; [and] ataxia." *Id.* at (c)(15)(III).[6]

A consistent starting consideration in determining pain and suffering awards in the context of a GBS injury is that the amounts should exceed "those awarded to petitioners who have suffered a less frightening and physically alarming injury, such as SIRVA."[7] *Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. March 11, 2021); *see also, e.g.*, *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497, at *10 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (emphasizing recognition of "the seriousness of GBS as a general matter," in awarding a six-figure sum); *Voeller v. Sec'y of Health & Hum. Servs.*, No. 20-1526V, 2023 WL 5019830, at *10 (Fed. Cl. Spec. Mstr. July 6, 2023) (noting GBS's "frightening" nature).

But of course, not every GBS case is equally severe. Further details of the initial medical course are considered – including any mistake or delay in diagnosing GBS; any in-patient hospitalization and/or in-patient rehabilitation (and the duration of any such stays); diagnostic procedures (e.g., bloodwork, lumbar punctures, electrodiagnostic studies, imaging); the severity of symptoms at their nadir (e.g., involving incontinence or respiratory failure); the extent and effectiveness of treatment (e.g., IVIg, plasmapheresis, pain medications); other interventions (e.g., feeding tubes, breathing tubes, catheterization); and any complications (e.g., sepsis during hospitalization).

Also relevant is a petitioner's long-term course – as evidenced by out-patient therapies, neurology evaluations, and other medical appointments concerning GBS; the results of repeat electrodiagnostic studies and other relevant tests; medical providers' assessments of the degree of recovery achieved; ongoing reliance on assistive devices and medications; and relevant treatment gaps. Previous opinions have recognized that "a substantial recovery does not mean that [an individual] has fully recovered from his GBS and has no ongoing sequelae. It is common for petitioners to experience ongoing symptoms of GBS, such as numbness and fatigue, even with a good recovery." *Elenteny v. Sec'y of Health & Hum. Servs.*, No. 19-1972V, 2023 WL 2447498, at *5 (Fed. Cl. Spec.

---

[6] *See also National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table – Notice of Proposed Rulemaking*, 80 Fed. Reg. 45132, at 45144 – 45 (July 29, 2015) (proposing addition of Table flu/GBS claims – explaining GBS is "an acute paralysis caused by dysfunction in the peripheral nervous system [that…] may manifest with weakness, abnormal sensations, and/or abnormality in the autonomic (involuntary) nervous system," and that death, when it occurs, is most often related to respiratory failure).

[7] Shoulder injury related to vaccine administration ("SIRVA") is another Table injury. 42 C.F.R. §§ 100.3(a), (c)(10).

Mstr. Mar. 10, 2023). But symptoms of that nature are typically folded into a "typical" past pain and suffering award, and will not justify a future component. *See, e.g.*, *id.*; *Miller v. Sec'y of Health & Hum. Servs.*, No. 21-1559V, 2023 WL 2474322, at *8 (Fed. Cl. Spec. Mstr. Feb. 10, 2023).

In addition, "[t]he mere fact that a claimant had pre-vaccination comorbidities does not *per se* diminish the impact of [the vaccine injury] on his life – especially one as alarming and potentially life-altering as GBS – and therefore is not alone reason for a lower award." *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021). But a special master is statutorily required to consider to what extent a petitioner's pain and suffering is truly "*from* the vaccine-related injury," Section 15(a)(4) (emphasis added), and not from any unrelated preexisting or subsequently-developed medical issues. *See, e.g.*, *Bircheat*, 2021 WL 3026880, at *4; *Gross*, 2021 WL 2666685, at *5.

Also worthy of consideration are the injury's impact on a petitioner's personal circumstances including his or her family and other personal obligations, and professional life (whether or not lost wages are directly claimed).

All of these facts are primarily gleaned from the medical records – although sworn statements and/or other evidence often *supplements* the record evidence, and/or corroborates important fact contentions.

### III. Appropriate Compensation for Pain and Suffering

Petitioner has requested an award of $180,000.00 for Petitioner's actual pain and suffering, while Respondent recommends an award of $95,000.00. The parties agreed upon an award of $403.95 for Petitioner's unreimbursed expenses. ECF Nos. 32, 33.

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed and fully considered the record as a whole, including the medical treatment evidence, affidavits, and all assertions made by the parties in their briefs and at the expedited motions day hearing held in this matter. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

The evidence shows that Petitioner, then 26 years old at the time of vaccination and enlisted in active duty with the United States Army,[8] suffered a moderate case of vaccine-associated GBS. Petitioner's initial symptoms included many common GBS symptoms, such as weakness, tingling and numbness in the upper and lower extremities, back pain, vision and speech disturbances, and gait and balance issues – which were acute and understandably alarming. Ex. 6 at 10-13, Ex. 2 at 18.

Petitioner's course was initially complicated by a delay in obtaining a diagnosis for his GBS. He was first admitted to the emergency department on December 21, 2022, for only two days without a GBS diagnosis being made. Ex. 6 at 44-45. Petitioner then returned to a different hospital, Walter Reed Medical Center, on December 26, 2021, when his symptoms did not improve. Ex. 2 at 18. Petitioner was admitted to Walter Reed Medical Center for five days and underwent MRIs of the brain and spine, an unsuccessful lumbar puncture, and testing for infectious diseases. Ex. 2 at 6-8, 48-49. Petitioner's clinical course was found consistent with GBS and he underwent five days of IVIG therapy before being discharged. At discharge, he was ambulatory but required assistance, suffered mild back pain, was prescribed Lidoderm patches, and was provided guidance to treat his pain with acetaminophen. Ex. 2 at 6. Petitioner was further prescribed outpatient physical therapy and advised to follow-up with neurology. *Id.*

Subsequently, Petitioner's post-hospitalization clinical course was fairly limited, and he demonstrated a good overall recovery and prognosis despite some residual symptoms. Petitioner engaged in five outpatient physical therapy sessions between January 6, 2022 and January 25, 2022. Ex. 7 at 5-18. By January 18, 2022, Petitioner reported to his physical therapist that he "[f]eels he is back to 100%, but is a little worried about is balance." *Id.* at 10. On January 25, 2022, Petitioner's physical therapist stated "[p]atient notes they are performing at their prior level of function," and he was discharged from physical therapy having been found to have met all his goals of therapy. *Id.* at 6. That same day, Petitioner was seen by Bryan Jow, MD, for a GBS follow-up visit. Ex. 13 at 53. Petitioner advised Dr. Jow that "his recovery has been going well, but he has been experiencing back pain and headaches" four times a week. *Id*. Petitioner also reported he experienced pain when moving eyes right or left. *Id*. Petitioner was prescribed sumatriptan for his headaches, and cyclobenzaprine for his back pain. *Id*. at 55.

On March 8, 2022, Petitioner had a Behavior Health evaluation in advance of his discharge from the military. It was noted he planned to return home to Maryland to stay with his family, and that he had a job lined up for the end of the month. Ex. 19 at 237.

---

[8] While a young man, Petitioner suffered significant co-morbidities at the time of his vaccination, and was in the process of being evaluated to determine if he could remain in the military. *See, e.g.,* Ex. 5 at 12, Ex. 19 at 287-90.

Petitioner's GBS was not discussed, although unrelated diagnoses were noted. *Id*. at 240. On March 11, 2022, Petitioner was evaluated for a medical discharge from the military. *Id*. at 232. The basis for separation was "depressive disorder."[9] *Id*. at 232. A neurological exam was normal, as was Petitioner's strength and gait. It was noted that Petitioner complained of "chest pains/back pains/headaches." *Id*.

On June 2, 2022, Petitioner was seen for a VA disability rating. Ex. 22 at 1140. His GBS diagnosis was noted. *Id*. at 1141. Petitioner stated that "most [of his] symptoms have resolved but gets intermittent tingling throughout his body, headache." *Id*. On examination, Petitioner's measurements for strength were all full 5/5. *Id*. at 1143. Petitioner had no muscle atrophy, and his reflexes were normal. *Id*. His sensation testing for light touch was normal. *Id*. at 1144. His nerve testing was normal, except that he demonstrated mild incomplete paralysis of the right and left musculocutaneous nerves, and superficial peroneal nerves. *Id*. at 1145-48. It was noted that Petitioner required no assistive devises for locomotion. *Id*. at 1148. Petitioner was found to have a 0% disability related to his GBS. *Id*. at 98-99, 147-148.

Petitioner was seen on July 29, 2022 – seven months after his GBS hospitalization discharge – for an annual exam by his primary care provider. Ex. 26 at 35. Petitioner's neurological examination was normal, and he stated that "all [GBS] symptoms have resolved, and he is doing well, no concerns." *Id*. at 36.

On December 9, 2022, Petitioner was seen for a neurology consultation and GBS evaluation – now approximately 13 months post vaccination. Ex. 16 at 3. It was noted that since the onset of his GBS, Petitioner has complained of lower back pain, and "occasionally he will have a headache." *Id*. His neurological exam was normal, except for a finding related to his reflexes. *Id.* ("deep tendon reflexes are absent throughout. Toes are downgoing.") Petitioner was assessed with a history of GBS "with very mild residua. Probably situational depression. Lower back pain." *Id*.[10]

Petitioners' subsequent medical visits do not discuss any ongoing GBS symptoms or neurological issues. In his sworn declaration filed February 6, 2025, Petitioner described the onset of his GBS, and his ongoing symptoms and limitations on his daily activities that he has experienced since his GBS diagnosis. Ex. 29. In particular, Petitioner describes experiencing back pain, severe migraine headaches, difficulty when navigating stairs, sleep disruptions, and a loss of strength, reflexes and range of motion which have impacted his ability to exercise. Ex. 2.

---

[9] Petitioner's depression predated the onset of his GBS. *See, e.g,* Ex. 19 at 370, 438.

[10] While I observe that Petitioner likely experienced "situational depression" related to his GBS, his depression clearly pre-existed his GBS (*see supra* footnote 9), and there is no evidence Petitioner has continued to suffer depression related to his GBS.

Petitioner cites *Johnson v. Sec'y of Health & Hum. Servs*. No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) ($180,000.00 for past pain and suffering*)*, and *T.M. v. Sec'y of Health & Hum. Servs.* No. 19-119V, 2023 WL 355358 (Fed. Cl. Spec. Mstr. Jan. 23, 2023) (same), in support of his request in this case. However, I observe that the petitioners in these decisions (both issued by another special master) suffered more severe injuries than Petitioner herein. Additionally, the *Johnson* petitioner completed 45 physical therapy sessions, was unable to walk unassisted or drive for three and a half months post hospitalization, and suffered incontinence for years. *Johnson,* 2018 WL 5024012 at *4, 7-8. I note that the *T.M.* petitioner's GBS sequela was significant enough to justify a future award of pain and suffering, and she required nine days in-patient rehabilitation after her initial hospitalization (factors not present in the instant case). *T.M.*, 2023 WL 355358 at *4, 19.

Respondent offers two different cases in support of his recommended award of $95,000.00: *Granville v. Sec'y of Health & Hum. Servs*, No. 21-2098V, 2023 WL 6441388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023)(awarding $92,500.00 in pain and suffering), and *Castellanos v. Sec'y of Health & Hum. Servs*, 2022 WL 1482497 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (awarding $125,000.00 in pain and suffering). While I find that Petitioner's injury was more severe than that suffered by the *Granville* petitioner, the *Castellanos* decision, although offered by Respondent to justify his lower proposed award, is a good comparable despite some case specific distinctions. Both petitioners had comparable hospitalization periods (seven total days for Petitioner herein, and nine days for Mr. Castellanos), as well as underwent five-day courses of IVIG. *Castellanos,* 2022 WL 1482497, at *9. While both petitioners made good recoveries within six months of their initial GBS diagnoses, they also both suffered some ongoing residual symptoms of their GBS. *Id.* at *9-10. Although, I observe both petitioners suffered co-morbidities, comorbidities of that petitioner were somewhat more difficult to disentangle from his lingering GBS symptoms than those of Petitioner herein (although I have found Petitioner herein likely experienced situational depression from his GBS which overlapped with his existing diagnosis of depression). *Id.* Additionally, while the *Castellanos* petitioner's initial injury course was more severe than that suffered by Petitioner (he required inpatient rehabilitation post hospitalization, which Petitioner herein did not, and underwent more physical therapy sessions), Petitioner's later injury course appears to be somewhat more severe. *Id.* at *10. Of note, while Respondent disputed that the *Castellanos* petitioner had even established that he suffered the severity of his injury for more than six months, Respondent did not dispute the initial six-month sequela of Petitioner's GBS. *Id.* at *1.

Based upon the above factors, I find that Petitioner has established his injury is comparable to that of the *Castellanos* petitioner, and a similar, but slightly lower award than the $125,000.00 awarded therein is appropriate in this case.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $120,000.00 represents a fair and appropriate amount of compensation for Petitioner's past/actual pain and suffering.[11]**

**I therefore award Petitioner a lump sum payment of $120,403.95, (representing $120,000.00 compensation for his actual pain and suffering and $403.95 for his unreimbursed expenses) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[12]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[11] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.